## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARSHA SCOTT and VICKI HARGIS,
individually and on behalf of similarly
situated persons,

    *Plaintiffs*,

 vs.            Case No. 08-4045-EFM

RAUDIN MCCORMICK, INC. et al.,

    *Defendants.*

### MEMORANDUM AND ORDER

   This action comes before the Court on Plaintiffs' claims of unpaid wages and overtime in

violation of both federal and state law.  Plaintiffs were employed as drivers for Defendants, where

their duties required them to transport railroad company crews to various locations.  Prior to taking

these trips, Plaintiffs were required to perform certain pre- and post-trip vehicle inspections for

which they claim they received no compensation.  Plaintiffs also claim that they were required to

attend mandatory safety meetings and submit to random drug testing, often when they were off-duty,

for which they also were not compensated.  Plaintiffs allege that the Defendants' conduct violated

the Fair Labor Standards Act (FLSA),[1] violated various state wage payment acts, and breached their

implied contract.  Plaintiffs also claim a right to recover their unpaid wages under *quantum meruit*.

---

[1] 29 U.S.C. § 201 *et seq.*

## I. Background

Plaintiffs are past and current employees of Defendants Raudin McCormick, Inc., J.L.S., Inc, and/or Browns Crew Car of Wyoming, Inc.  Railcrew Xpress, L.L.C., also a party to this action, is the holding company of these three defendants (herinafter "Corporate Defendants").[2]  Defendants W. Scott Boyes and David R. Lyn (hereinafter "Individual Defendants") are parties to this action in their individual and official capacities as President and Vice President of Corporate Defendants, respectively.

Corporate Defendants contract with federally regulated railroads to provide motor vehicle transportation services for rail crews and their equipment.  To meet their contractual obligations with these railroads, Corporate Defendants employed Plaintiffs as drivers to work in one of three capacities: yard driver, radius driver, and long haul driver.  A yard driver drives almost exclusively within a terminal area, but may in some instances be required to drive a short distance outside of the terminal area.  Yard drivers are compensated by an hourly rate of pay.

In contrast to yard drivers, radius drivers are responsible for longer trips that often require them to cross state lines.  Radius drivers, however, are typically limited to trips within 60 miles of the terminal area.  Radius drivers are also compensated by an hourly rate of pay.  Long haul drivers normally drive long-distance trips, with the majority of such trips requiring drivers to travel interstate.  The length of each trip, however, varies depending on the particular rail carrier's requirements.  Long haul drivers are paid by both an hourly rate of pay for what Plaintiffs refer as non-driving activities, and a per-mile rate for driving time.  Defendants contend that for each

---

[2]Railcrew Xpress was the former holding company of the three corporate defendants and has been dissolved.

individual trip, a minimum rate of $12.50 is paid regardless of the trip's distance.  Defendants also claim that on occasion, a long haul driver may drive a yard shift, in which case the driver is paid an hourly rate, and similarly, yard and radius drivers may drive a long distance trip, and are paid on a per-mile basis.  Defendants claim that during each driver's interview for employment, this pay scheme is discussed and agreed to by the employee.

As part of the drivers' responsibilities, Defendants require pre- and post-trip inspections of the vehicles.  As part of these inspections, the drivers are required to complete an inspection checklist, which notes the condition of approximately 15 specific items concerning the vehicle's equipment and safety gear.  Plaintiffs contend that such inspection was required to be completed by such time that the drivers were available to pick up the crew members at the scheduled times. Frequently, Plaintiffs suggest this requirement necessitated that the inspection be completed prior to or after the employee's assigned shift.  On completing a trip, long haul drivers are required to "close out" their trip, which requires contacting one of Defendants' dispatchers and providing certain information concerning the details of the trip.  These details include the driver's name and run number, authorization number, trip times, wait times, and odometer readings.  Drivers are also required to refuel and clean their vehicles at the close of their shift.

In addition to their driving duties, Plaintiffs were required to attend meetings, which they characterize as "safety meetings," that included information relating to their jobs, work safety, and anti-union discussions.  Plaintiffs were also required to submit to random drug testing as part of their employment, which was at times conducted after they were relieved of duty.

Plaintiffs allege that Defendants conduct in not paying wages and overtime for work performed violated the Federal Labor Standards Act (FLSA), and also allege state law claims for

breach of implied contract, and violation of state wage payment acts.  Plaintiffs also bring an alternative claim for recovery under *quantum meruit*.[3]  Plaintiffs move for summary judgment on their FLSA claims in which they ask the Court to decide as a matter of law: (1) whether Defendants' operations are exempt under the FLSA; (2) whether Plaintiffs' pre and post trip activities are "work" under the FLSA; (3) whether Plaintiffs' non-revenue runs are compensable; (4) whether Defendants are required to compensate Plaintiffs for mandatory drug testing, to include travel time; and (5) whether Defendants are required to compensate Plaintiffs for mandatory safety meetings.  Plaintiffs acknowledge that the number of hours worked or the amount owed is a question of fact that is inappropriate for summary judgment.  Corporate Defendants also filed cross motions for summary judgment on Plaintiffs' FLSA claims and state law claims, which the Individual Defendants join.

## II. Summary Judgment Standard

The Court is familiar with the standards governing the consideration of Summary Judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[4]  An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim.[6]  In considering a motion for summary judgment, the Court must

---

[3]Plaintiffs also seek class action certification for their state law claims, and have received conditional class certification for their FLSA claims.

[4]Fed. R. Civ. P. 56(c).

[5]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).

[6]*Id.*

examine all of the evidence in a light most favorable to the nonmoving party.[7]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to summary judgment.[8]  The moving party is not required to disprove the nonmoving party's claim or defense, but must only establish that the factual allegations have no legal significance.[9]  If this initial burden is met, the nonmovant must then set forth specific facts showing that there is a genuine issue for trial.[10]  In doing so, the opposing party may not rely on mere allegations or denials in its pleadings, but must present significant admissible probative evidence supporting its allegations.[11]  The Court is also cognizant that it may not make credibility determinations or weigh the evidence when examining the underlying facts of the case.[12]

Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13]

## III. Analysis

### A. Fair Labor Standards Act

All parties move for summary judgment on the issue of whether Defendants are exempt from the obligation to pay overtime wages to their employees pursuant to the FLSA.  Defendants claim

---

[7]*Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 557 (10th Cir. 2001).

[8]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[9]*Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

[10]*Celotex*, 477 U.S. at 323.

[11]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

[12]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[13]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

that their operations are exempt under both the FLSA's rail carrier exemption[14] and motor carrier exemption,[15] entitling them to summary judgment.  We will address each exemption in turn.

### 1. Rail Carrier Exemption

This Court, in *Tews v. Renzenberger, Inc.,*[16] recently conducted a thorough analysis of the rail carrier exemption under the FLSA.  The FLSA exempts from the act's overtime provisions "any employee of an employer engaged in the operation of a rail carrier subject to part A of subtitle IV of Title 49."[17]  An employer may demonstrate that it is subject to part A of subtitle IV of Title 49 by showing either that (1) its activities constitute transportation by rail carrier, thereby providing the Surface Transportation Board with jurisdiction over such activities,  or (2) "its activities fall within the 'terminal area' exception to jurisdiction under the Motor Carrier Act (MCA)."[18]  Defendants contend that they can make both these showings, thus warranting summary judgment.

### a. Transportation by Rail Carrier

As explained in *Tews*,[19] for an employer to establish that it is subject to the Surface Transportation Board's (STB) jurisdiction under 49 U.S.C. § 10501(a) and therefore exempt from the overtime provisions of the FLSA, the employer must demonstrate that not only do its activities

---

[14]29 U.S.C. § 213(b)(2).

[15]*Id.* § 213(b)(1).

[16]592 F. Supp. 2d (D. Kan. 2009).

[17]29 U.S.C. § 213(b)(2).

[18]*Tews v. Renzenberger, Inc.*, 592 F. Supp. 2d 1331, 1339 (D. Kan. 2009); 49 U.S.C. § 10501(a), 13503(b)(1) & (2).

[19]This Court has reviewed Judge Lungstrum's detailed analysis of both the Rail Carrier Exemption and Motor Carrier Act Exemption, and finds that the reasoning set forth therein is sound based on current law.  The Court, therefore, will not restate the legal analysis of these exemptions in full, but instead refers to the *Tews* opinion for its legal holding on the issues of law before the Court with regard to this matter.

constitute "transportation,"[20] but it must also show that such transportation is "performed by, or under the auspices of, a 'rail carrier.'"[21]  A rail carrier is defined as "a person providing common carrier railroad transportation for compensation."[22]  Therefore, before an employer can claim the rail carrier exemption, it must show that it is a common carrier.[23]  To be a "common carrier" means that the services offered are publicly available, which can occur by either offering the service directly to the public, or the service can be "part of the total rail common carrier service that is publicly offered."[24]

Plaintiffs contend that Defendants cannot claim the rail carrier exemption because they are not "rail carriers," nor do they operate as "rail carriers," because they do not make their transportation services available to the public.  Plaintiffs assert that Defendants' service is to provide rail-crew transportation solely for those railroads for which they contract, and they do not offer or perform that service for the general public.  In response, Defendants do not directly address this issue, but instead appear to relate their arguments concerning their classification as a rail carrier to the provisions of the terminal area exception, arguing that they are statutorily categorized as being subject to regulation as if they were rail carriers, and thus, are not subject to the overtime provisions of the

---

[20]Transportation is defined as including: (A) a locomotive, car, vehicle . . . facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and (B) services related to that movement, including receipt, delivery . . . transfer in transit . . . and interchange of passengers and property.  49 U.S.C. § 10102(9).

[21]*Tews*, 592 F. Supp. 2d at 1339 (citing *Town of Babylon & Pinelawn Cemetery*, STB Fin., 2008 WL 275697, at *3 (Feb. 1, 2008)).

[22]49 U.S.C. § 10102(5).

[23]*Ass'n of P & C Dock Longshoremen v. Pittsburgh & Conneaut Dock Co.*, 8 I.C.C.2d 280, 293 (1992) (STB's jurisdiction over rail carriers is limited to common carriers).

[24]*Tews*, 592 F. Supp. 2d at 1340; *Ass'n of P & C Dock Longshoremen*, 8 I.C.C.2d at 293-94.

FLSA.  Defendants' arguments, however, are misplaced regarding this prong of the analysis, and because they are more appropriate for assessing applicability of the terminal area exception, we will address Defendants' arguments below when addressing that exemption.

Here, the record before the Court indicates, and Defendants have provided no evidence to the contrary, that Defendants themselves do not extend their transportation services to the public. In addition, the rail carriers with which Defendants contract neither offer Defendants' transportation services directly to the public or as part of the their common carrier transportation package.  Rather, Defendants provide the transportation services exclusively for the rail carriers' crews.  Thus, Defendants are not common carriers, and as a result, are not "rail carriers" subject to the STB's jurisdiction under 49 U.S.C. § 10501(a).[25]  As a result, Defendants may not claim this exemption on the basis of transportation by rail carrier.

### b. Terminal Area Exception

An employer may also claim exemption to the overtime provisions of the FLSA if it can show that its activities subject it to regulation as if it were a rail carrier under the Motor Carrier Act's (MCA) terminal area exception.  The MCA's terminal area exception provides, in relevant part, that:

(1) Except to the extent provided by paragraph (2) of this subsection, neither the Secretary [of Transportation] nor the [Surface Transportation] Board has jurisdiction under this subchapter over transportation by motor vehicle provided in a terminal area when the transportation - -

(A) is a transfer, collection, or delivery; and

(B) is provided by a person as an agent or under other arrangement for - -

(i) a rail carrier subject to jurisdiction under chapter 105 of this title.

---

[25]*See Tews*, 592 F. Supp. 2d at 1340.

-8-

. . . .

(2) Transportation exempt from jurisdiction under paragraph (1) of this subsection is considered transportation provided by the carrier . . . for whom the transportation was provided and is subject to jurisdiction under chapter 105 of this title when provided for such a rail carrier . . . .[26]

The effect of this subsection excepts the Secretary's and STB's jurisdiction under part B of subtitle IV of Title 49, and places such terminal area transportation under the STB's jurisdiction over rail carriers under chapter 105 of part A of subtitle IV of Title 49.  Therefore, an employer that is able to demonstrate that it provides motor vehicle transportation pursuant to 49 U.S.C. § 13503(b) is exempt from the overtime provisions of the FLSA in providing that transportation.

Defendants argue that they are exempt from the overtime provisions of the FLSA under the MCA's terminal area exception.  They assert that because their services involve a transfer, collection, or delivery within terminal areas for rail carriers that are subject to the STB's jurisdiction, they are to be treated as if they were those rail carriers, thereby bringing them within the jurisdiction of the STB, and therefore, within the exemption criteria of 29 U.S.C. § 213(b)(2).  Defendants further contend that once an employer is found to fall within the rail carrier exemption, it is exempt from the FLSA's overtime provisions with regard to all of its employees, whether or not those employees provide terminal area transportation full time.

The Court has previously evaluated the MCA's terminal area exception in *Tews*, where the defendants in that case made similar arguments to those presented by Defendants in the instant action concerning the exception's reach.  After reviewing the same cases upon which Defendants rely in this case, the Court in *Tews* determined that such an "expansive reading of the terminal area

---

[26]49 U.S.C. § 13503(b).

exception effectively renders the exception meaningless and, in any event, it is unsupported by both

the text of the statute and the ICC's construction of the exception."[27]  Defendants, however, suggest

that, in *Tews*, the Court's interpretation of the exception was flawed because the Court analyzed the

exemption based on whether the class of drivers were exempt–an employee based analysis–rather

then determining whether the employer was exempt.  Defendants argue that the express language of

the rail carrier exemption requires an analysis based on the employer's status, and because *Tews*

failed to evaluate the statute in this context, it should be rejected.  We disagree.

In *Tews*, the Court conducted a thorough analysis of the terminal area exception, and in doing

so, reviewed the Seventh Circuit's holding in *Cederblade v. Parmelee Transportation Company*,[28]

which explained both the basis of the exception and the Interstate Commerce Commission's (ICC)

interpretation of the exception.  As explained in *Tews* with regard to the Seventh Circuit's decision

in *Cederblade*:

> [T]he Interstate Commerce Commission, since 1912, had exercised its power over
> collection and delivery services by motor vehicle within railroad terminal areas under
> Part I of the Interstate Commerce Act.   Consistent with this practice, the Motor
> Carrier Act of 1935 (then known as Part II of the Interstate Commerce Act) evidences
> that Congress did not intend to include within the Act all interstate motor vehicle
> operations because some such operations were already subject to the jurisdiction of
> the ICC under Part I of the Interstate Commerce Act.[29]

The Court also found persuasive the ICC's analysis of the exception in *Scott Brothers, Inc.*,[30] which

distinguished between "terminal area transportation" and other, intercity or long-haul, transportation.

---

[27]*Tews*, 592 F. Supp. 2d at 1342.

[28]166 F.2d 544 (7th Cir. 1948).

[29]*Tews*, 592 F. Supp. 2d at 1341 (internal citations omitted).

[30]4 M.C.C. 551, 552 (1938).

Indeed, the Interstate Commerce Commission itself interpreted this exception to jurisdiction in the Motor Carrier Act of 1935 as entirely consistent with its findings that collection and delivery services "within terminal districts" are excluded from Part II of the Interstate Commerce Act but that "intercity motor vehicle operations of railroads" are included under that part. "'It was well known to Congress that the Commission had made a distinction with reference to "such motor vehicle operations of carriers by rail," to the effect that those which were performed in connection with terminal service were subject to its jurisdiction under part I, whereas those which were of a line-haul or intercity character were not so subject. The plain intent was to make it clear that the latter should be subject to our jurisdiction under part II, but that the former should remain subject to the provisions of part I.'"[31]

After reviewing the statutes comprising the terminal area exception, we are similarly convinced that such an expansive reading is not justified by the exception's language. As previously stated, an employer falls within the rail carrier exemption if it can demonstrate that it is engaged in the operation of a rail carrier subject to part A of subtitle IV of Title 49.[32] The terminal area exception of the MCA brings an employer under the jurisdiction of part A only if that employer provides transportation service within a terminal area for a rail carrier that is itself subject to the STB's jurisdiction.[33] The exemption is based on the service the employer provides for the rail carrier, which specifically, is the transportation by motor vehicle taking place within the terminal area and provided by the employer's employees. As the statute indicates, it is this transportation within the terminal area that permits the exemption, and only when the employer provides this specific service for the rail carrier is the employer treated as if it were the rail carrier.[34] Therefore, consistent with the Court's analysis in *Tews*, we find that an employer is only exempt from the

---

[31]*Tews*, 592 F. Supp. 2d at 1341 (quoting *Scott Bros, Inc.*, 4 M.C.C. at 556).

[32]29 U.S.C. § 213(b)(2).

[33]49 U.S.C. § 13503(b)(1).

[34]*Id.* § 13503(b)(2).

-11-

overtime provisions of the FLSA under the terminal area exception of the MCA when providing transportation service by motor vehicle within a terminal area, and only for those employees furnishing such service, providing 49 U.S.C. § 13503(b)(1)(B) is also satisfied.

Here, Defendants employ drivers to perform three types of services for the rail carriers with which they contract: yard drivers, radius drivers, and long haul drivers. Yard drivers' services are limited to a small geographic area, and are usually confined exclusively to the terminal area. Some yard drivers, however, may drive outside the terminal area when a situation requires such an interstate trip. Radius drivers are required to drive long distance trips, frequently crossing state line; however, Defendants contend that these trips are typically limited to sixty miles of the terminal area. Long haul drivers provide long distance, interstate transportation services on a regular basis. Defendants, however, assert that on occasion, a long haul driver may be asked to provide services within terminal areas similar to yard drivers.

Based on the foregoing, we conclude that Defendants' yard drivers, when providing services within the terminal area, are exempt from the overtime provisions of the FLSA under the terminal area exemption. However, Defendants' radius and long haul drivers are not exempt from the FLSA's overtime provisions for the transportation service they perform outside of the rail carriers' terminal area.

### 2. Motor Carrier Act Exemption

Defendants argue they are also exempt from the overtime provisions of the FLSA by virtue of the Motor Carrier Exemption under 29 U.S.C. § 213(b)(1), and therefore, entitled to summary judgment on this issue. Section 213(b)(1) exempts from the FLSA's overtime provisions "any employee with respect to whom the Secretary of Transportation has power to establish qualifications

and maximum hours of service pursuant to the provisions of section 31502 of Title 49."  Section 31502 provides the Secretary of Transportation with the authority to "prescribe requirements for qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier."[35]  The MCA's general limitation on jurisdiction limits the Secretary's authority, in pertinent part, to transportation in interstate commerce.[36]

Prior to 2005, the MCA defined a motor carrier as "a person providing motor vehicle transportation for compensation."[37]  However, on August 10, 2005, Congress amended the definition of "motor carrier" through the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), by replacing "motor vehicle" with "commercial motor vehicle (as defined in section 31132)."[38]  Under section 31132, a "commercial motor vehicle" means, in pertinent part, a motor vehicle used on public highways in interstate commerce so long as the motor vehicle has a gross vehicle weight of at least 10,001 pounds and is designed to transport more than eight passengers, which includes the driver.[39]  As a result of this amendment, motor carriers operating vehicles of 10,000 pounds or less designed to transport eight or less passengers were no longer exempt from paying their employees overtime under the FLSA.

On June 6, 2008, Congress enacted the SAFETEA-LU Technical Corrections Act (TCA), whereby it once again amended the definition of "motor carrier," returning it to its pre-SAFETEA-

---

[35]49 U.S.C. § 31502 (b)(1).

[36]*Id.* § 13501; *Tews*, 592 F. Supp. 2d at 1343.

[37]49 U.S.C. § 13102(12) (2002).

[38]*Tews*, 592 F. Supp. 2d at 1343 (citing Pub. L. No. 109-59, § 4142(a), 119 Stat. 1747 (2005) (codified as amended at 49 U.S.C. § 13102(14))).

[39]49 U.S.C. § 31132(1).

-13-

LU state, to mean "a person providing motor vehicle transportation for compensation."[40]  As a result, the MCA once again exempted from the FLSA's overtime provisions an employee of a motor carrier while operating a motor vehicle of 10,000 pounds or less designed to transport eight or less passengers when operated in interstate commerce.

Defendants suggest that by Congress enacting the TCA on June 6, 2008, it "retroactively eliminated any liability that had arisen for companies failing to pay overtime compensation to their employees between August 10, 2005 and June 6, 2008."[41]  Defendants argue that the TCA must be given retroactive effect because Congress explicitly mandated such in the language of the TCA. Defendants rely on the language of section 121(b)(2) of the TCA, which states that "[e]ach provision of the [SAFETEA-LU] (including the amendments made by that Act) (as in effect on the day before the date of enactment of this Act) that is amended by this Act . . . shall be treated as not being enacted."[42]  While Defendants acknowledge that no court to date has given the TCA retroactive effect, they suggest that the judicial treatment of the TCA has been uniformly wrong.  Summarized, Defendants argue that these past decisions were the result of improper and incomplete briefing by the parties, were based on an incorrect analysis of the TCA's language, failed to take into account the regulatory breadth of the transportation safety laws, and improperly interpreted Sections 305 and 306 of the TCA jointly.  As a result, Defendants argue that this Court should ignore the past judicial decisions declining to give retroactive effect to the TCA with regard to the motor carrier definition of the MCA.

---

[40]Tews, 592 F. Supp. 2d at 1346 (citing Pub. L. No. 110-244, § 305(c), 122 Stat. 1620 (2008) (codified as amended at 49 U.S.C. § 13102(14))).

[41]Defendants' Cross Motion for Summary Judgment on Plaintiffs' FLSA Claims (Doc. 278, p. 17).

[42]Technical Corrections Act, Pub. L. No. 110-244, § 121(b)(2), 122 Stat. 1608 (2008).

-14-

After thoroughly reviewing the TCA, along with the case law relating to its retroactive effect,[43] we are convinced that the decision reached by this district in *Tews,* that section 305 does not apply retroactively, was correct, and we are not inclined to deviate from that decision.  The Supreme Court has stated that the presumption against applying a statute retroactively generally coincides with both legislative and public expectations, which "accords with widely held institutions about how statutes ordinarily operate."[44]  To require clear intent that a statute apply retroactively "assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits."[45]

To determine whether a statute applies retroactively, we first determine whether Congress expressed its intentions as to the temporal reach of the statute.[46]  If the Court cannot ascertain Congress' intent, we then consider whether the statute has a retroactive effect.[47]  If a statutory provision, enacted after the events pertaining to the suit, does not expressly prescribe its own "temporal reach," but has a retroactive effect - i.e., would impair rights a party possessed when he acted, increase his liability for past conduct, or impose new duties with respect to transactions already completed - the traditional presumption is that the statute is not applied retroactively absent

---

[43]*See Benoit v. Tri-Wire Eng'g Solutions, Inc.*, 612 F. Supp. 2d 84 (D. Mass. 2009); *Tews*, 592 F. Supp. 2d at 1343; *Loyd v. Ace Logistics, LLC*, 2008 WL 5211022, at *8 (W.D. Mo. Dec. 12, 2008); *Villegas v. Dependable Constr. Servs., Inc.*, 2008 WL 5137321, at *21 (S.D. Tex. Dec. 8, 2008); *Veliz v. Cintas Corp.*, 2008 WL 4911238, at *4 (N.D. Cal. Nov. 13, 2008); *Vidinliev v. Carey Int'l, Inc.*, 581 F. Supp. 2d 1281 (N.D. Ga. 2008).

[44]*Landgraf v. USI Film Products*, 511 U.S. 244, 272-273 (1994).

[45]*Id.*

[46]*Valdez-Sanchez v. Gonzales*, 485 F.3d 1084, 1088 (10th Cir. 2007) (citing *Landgraf*, 511 U.S. at 280).

[47]*Id.* (citing *Landgraf*, 511 U.S. at 280).

clear congressional intent favoring that result.[48]

After reviewing the language of the TCA, we are unable to conclude that Congress clearly and unambiguously intended for its re-amending of the definitions relating to motor carriers in section 305 of the TCA (applying to 49 U.S.C. § 13102) to apply retroactively.  Defendants focus their arguments on the effective dates of amendments of the TCA as set forth in section 121, which states:

> (a) IN GENERAL.  Except as otherwise provided in this Act (including subsection (b)), this Act and the amendments made by this Act take effect on the date of enactment of this Act.

> (b) EXCEPTION.

>> (1) IN GENERAL.  The amendments made by this Act (other than the amendments made by sections 101(g), 101(m)(1)(H), 103, 105, 109, and 201(o)) to the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (Public Law 109–59; 119 Stat. 1144) shall

>>> (A) take effect as of the date of enactment of that Act; and

>>> (B) be treated as being included in that Act as of that date.

>> (2) EFFECT OF AMENDMENTS.   Each provision of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (Public Law 109–59; 119 Stat. 1144) (including the amendments made by that Act) (as in effect on the day before the date of enactment of this Act) that is amended by this Act (other than sections 101(g), 101(m)(1)(H), 103, 105, 109, and 201(o)) shall be treated as not being enacted.[49]

As indicated, the TCA, along with the amendments made by the TCA, take effect on the effective date of the TCA, which was June 6, 2008.  The provision provides exception for most amendments

---

[48]*Id.* (citing *Landgraf*, 511 U.S. at 280).

[49]Technical Corrections Act, Pub. L. No. 110-244, § 121(a)-(b), 122 Stat. 1608 (2008).

-16-

made by the TCA to the SAFETEA-LU, with those amendments taking effect as of the effective date

of the SAFETEA-LU, and the previous amendments to that Act shall be treated as if they had never

been enacted.  The question, then, is whether Section 305(c) is an amendment to the SAFETEA-LU

for the exception of section 121 to apply.  We conclude that section 305 is not an amendment to the

SAFETEA-LU, but rather, is an amendment to the ICC Termination Act, and therefore, has an

effective date of June 6, 2008.

Section 305 of the TCA provides, in pertinent part:

(c) DEFINITIONS RELATING TO MOTOR CARRIERS.  Paragraphs (6)(B),
(7)(B), (14), and (15) *of section 13102 of such title are each amended* by striking
''commercial motor vehicle (as defined in section 31132)'' and inserting ''motor
vehicle''.[50]

Section 13102 "of such title" refers to 49 U.S.C. § 13102.  As the court in *Vidinliev v. Carey*

*International, Inc.*[51] pointed out, and with which we agree,

[section 13102] of the code was created by the ICC Termination Act of 1995.  The
definitions in 49 U.S.C. § 13102 are relevant because under the Motor Carrier Act,
"motor carrier" and "private motor carrier" have the same meanings given those
terms in section 13102 of this title.  Therefore, section 305 of the Technical
Corrections Act is an amendment to the ICC Termination Act, which in turn affects
the scope of the Motor Carrier Act.  It is not . . . an amendment to the SAFETEA-
LU.[52]

As further support for this finding, and as explained in *Tews*, we find significant the safe

harbor provision that Congress provided to the innocent employer through section 306 of the TCA.[53]

---

[50]*Id.* at § 305(c), 122 Stat. at 1620 (emphasis added).

[51]581 F. Supp. 2d 1281 (N.D. Ga. 2008).

[52]*Id.* at 1289-90 (internal citations omitted); *see also Veliz v. Cintas Corp.*, 2008 WL 4911238, at *8 n.6
(N.D. Cal. Nov. 13, 2008) (noting that the ICC Termination Act created section 13102).

[53]*See Tews*, 592 F. Supp. 2d at 1347.

"[O]ne of the most basic interpretive canons [is] that a 'statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant."[54]  Section 306 limits an employers' liability for FLSA section 7 violations for those violations occurring in the one-year period beginning on August 10, 2005, the enactment date of the SAFETEA-LU, if the employer lacked actual knowledge that it was subject to section 7 of the FLSA with respect to such covered employee.[55]  Consistent with other courts' review of this issue, to find that section 305 applied retroactively would render section 306 "nothing more than surplusage,"[56] and therefore, would "violate a fundamental canon of statutory construction that every word in a statute must be given effect, if possible,"[57] and therefore, undermines a retroactive finding.

In addition to that just discussed, we also find instructive the manner in which Congress identified the statutory provisions that it intended to amend by the TCA.  In most all TCA provisions, Congress specifically indicated a specific section within an act or the act itself that it intended the section to amend.  For instance, in section 304 of the TCA states "Section 2003(c)(1) of the [SAFETEA-LU] is amended . . . ,"[58] while Section 305(a) states "Section 31138 of title 49, United

---

[54]*Corley v. United States*, –U.S. –, 129 S.Ct. 1558, 1566 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

[55]Technical Corrections Act, Pub. L. No. 110-244, § 306(a)-(b), 122 Stat. 1572 (2008).  A "covered employee" is defined as an individual employed by a motor carrier whose work is defined, in part, as a driver affecting the safety of operations of a motor vehicle weighing less than 10,000 pounds and designed to transport less 8 or less passengers, including the driver.  *Id.* at § 306(c), 122 Stat. at 1572.

[56]*Tews*, 592 F. Supp. 2d at 1347 (quoting *Vidinliev*, 581 F. Supp. 2d at 1291).

[57]*Id.* (citing *Hackwell v. United States*,491 F.3d 1229, 1235 (10th Cir. 2007)); *see also Veliz v. Cintas Corp.*, 2008 WL 4911238, at * 5 (N.D. Cal. Nov. 13, 2008) (retroactively applying section 305 would make the one-year defense within section 306 meaningless).

[58]Technical Corrections Act, Pub. L. No. 110-244, § 303.

-18-

States Code, is amended . . . ."[59]   Congress repeats this methodology throughout the TCA, demonstrating that some sections are intended to amend the SAFETEA-LU, while others are meant to amend other statutory provisions directly.  Accordingly, because of the specific wording Congress chose in section 305, we find that such provision was intended to amend not the SAFETEA-LU, but the ICC Termination Act.

As a result of the foregoing and consistent with the decision in *Tews*, we conclude that section 305 does not apply retroactively.  Therefore, Corporate Defendants' drivers were not exempt from the overtime provisions of the FLSA through the Motor Carrier Act exemption for the time period of August 10, 2005 through June 6, 2008.

### B. Employee Activities

Plaintiffs also move the Court to decide, as a matter of law: (1) whether the pre- and post-trip activities required of Plaintiffs by Defendants are considered "work" under the FLSA; (2) whether non-revenue runs allegedly required by defendants are compensable as "work"; (3) whether Plaintiffs are entitled to compensation for mandatory drug testing and travel time for such drug testing conducted after an employee has been relieved of duty; and (4) whether Plaintiffs are entitled to compensation for attending mandatory safety meetings held after the employee had been relieved of duty.  We will address each in turn.

### 1. Pre- and Post-Trip Activities

Plaintiffs contend that they did not receive compensation for pre- and post-trip activities that Defendants mandated be performed.  Prior to the start of each shift, Plaintiffs assert that they were required to perform a vehicle inspection that required them to check for operational or safety

---

[59]*Id.* § 305.

deficiencies.   This task included checking tires for wear and pressure, lights, horn, windshield wipers, oil level, transmission fluid, and safety equipment.   As part of this inspection, Plaintiffs contend that Defendants required them to complete a company form indicating the results.   At the conclusion of each trip, long haul drivers were required to "close out" the trip by submitting certain information to the dispatcher.   Afterwards, Plaintiffs were required to inspect, refuel, and clean their vehicle, all of which they allege was uncompensated by Defendants.   Defendants do not dispute that the pre- and post-trip inspections were required, but assert that company policy required that such inspections be completed at the beginning or end of the employee's shift, not before the driver's shift began or after their shift ended.   Defendants further argue that even if an employee conducted the inspection outside their shift, they were compensated.   Defendants suggest that the company contemplates such activities in setting a driver's per-mile pay rate, which every employee is informed of upon accepting the position.   As a result, the per-mile pay the driver receives for a trip is the employee's compensation for such pre- and post-trip tasks.

Although Defendants' assertions raise a factual question of whether the parties agreed or intended that such per-mile pay rate encompasses Plaintiffs' pre- and post-trip activities, we will nevertheless examine the alleged activities and determine whether the time spent conducting such activities must be compensated under federal law.   Generally, work performed by an employee in which the employer knows or has reason to believe is taking place, whether or not the employer requested that work, is work time that requires compensation.[60]   Congress, however, did not specifically define "work" within the FLSA, leaving the courts to decide on a case-by-case basis

---

[60]*See Smith v. Aztec Well Servicing Co.*, 462 F.3d 1274, 1285 (10th Cir. 2006); 29 C.F.R. § 785.11.

whether the activities an employee took part constituted "work" under the FLSA.[61]  In early Supreme

Court decisions, "work" was defined as the "physical or mental exertion (whether burdensome or

not) controlled or required by the employer and pursued necessarily and primarily for the benefit of

the employer and his business."[62]  Subsequent to these decisions, in 1947, Congress passed the

Portal-to-Portal Act,[63] which relieves an employer from back wages under the FLSA for "activities

which are preliminary to or postliminary to [the] activity or activities which such employee is

employed to perform, which occur either prior to the time on any particular workday at which the

employee commences, or subsequent to the time on any particular workday at which he ceases, such

principal activity or activities."[64]  While the Portal-to-Portal Act relieves an employer from

compensating an employee for certain travel activity, it did not alter the Supreme Court's previous

definition of "work."[65]  As explained by the Tenth Circuit in *Smith*,

> [T]he Supreme Court found that Congress passed the Portal-to-Portal Act still
> intending for an employee's activities to fall "within the protection of the [Fair Labor
> Standards] Act if they are an integral part of and are essential to the principal
> activities of the employees."  The Court therefore held "that activities performed
> either before or after the regular work shift ... are compensable under the
> portal-to-portal provisions of the Fair Labor Standards Act if those activities are an
> integral and indispensable part of the principal activities for which covered workmen
> are employed."[66]

Thus, "any activity that is integral and indispensable to the principal activity is itself a principal

---

[61]*Smith*, 462 F.3d at 1285 (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005)).

[62]*Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944); *see also Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 691-92 (1946).

[63]29 U.S.C. § 254.

[64]*Id.*

[65]*See Alvarez*, 546 U.S. at 27.

[66]*Smith*, 462 F.3d at 1287 (quoting *Steiner v. Mitchell*, 350 U.S. 247, 254, 256 (1956)).

activity under § 4(a) of the Portal-to-Portal Act," and is compensable work under the FLSA.[67]

Here, Defendants required all of its drivers to conduct pre- and post-trip inspections, and in fact, completing such inspections were a condition of their employment. As a result, we conclude that such pre- and post-trip inspections were an integral and indispensable part of Plaintiffs' principal activities for which they were employed with Defendants. Therefore, Plaintiffs are entitled to be compensated for such activity.[68]

### 2. Non-revenue runs

Plaintiffs also allege that they were not compensated for non-revenue runs, and move for summary judgment as to whether the non-revenue runs as required by Defendants are also compensable as work. Plaintiffs allege non-revenue runs include trips drivers made whereby vehicles were shuttled from one location to another or a run where the railroad cancelled, or "busted," a trip. Defendants fail to directly respond to Plaintiffs allegations regarding non-revenue runs other than to assert that Plaintiffs' allegations of unpaid time are vague, self-serving, and unsubstantiated, and argue that the hours Plaintiffs have worked has been paid.

The only activities excluded from FLSA coverage are those undertaken "for [the employees'] own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer."[69] Therefore, non-revenue runs, performed by an employee at the direction of the employer as part of the employee's duties, require compensation under the FLSA. Here, Plaintiffs allege that they were required to shuttle Defendants' vehicles from one location to

---

[67]*Id.* (quoting *Alvarez*, 546 U.S. at 36).

[68]We do not resolve the factual issues of whether Plaintiffs were, in fact, compensated for such work or whether their rate per mile constituted compensation for these pre- and post-trip inspections.

[69]*Dunlop v. City Electric, Inc.*, 527 F.2d 394, 398 (5th Cir. 1976).

another, and drive trips that were cancelled after dispatch but prior to completion, without compensation. These activities were clearly required by and for the benefit of Defendants, and were a part of Plaintiffs principal activities, performed as part of their ordinary work in the ordinary course of the business for which they were employed. Accordingly, we conclude that the activities involved with these particular described non-revenue runs meet the standards set forth by the Supreme Court for activity compensable under the FLSA.[70]

### 3. Mandatory drug testing and related travel time

Plaintiffs assert that they are entitled to compensation for drug testing that was required by Defendants. Defendants responded by arguing that because Plaintiffs have cited to no authority suggesting that an employee be compensated at straight time, let alone overtime, they cannot address the issue. In addition, Defendants assert that because Plaintiffs have failed to provide sufficient detail, they cannot respond to the allegations that any particular Plaintiff was not paid for drug testing.

Generally, an employee waiting for or receiving medical attention conducted at the direction of the employer during the employee's normal working hours on days the employee is working constitutes hours worked and requires compensation.[71] Here, however, the question is whether such mandatory drug testing after the employee is relieved of duty qualifies as hours worked so as to require compensation. We conclude that it is.

Under the FLSA, any activity that is an integral and indispensable part of an employee's

---

[70]The Court again notes that we are not deciding through this holding whether the employees were, in fact, paid for performing these non-revenue runs.

[71]29 C.F.R. §785.43.

principal activity is compensable.[72]  What constitutes an employee's principal activity is to be construed liberally.[73]  Here, mandatory drug testing is an activity that is an essential requirement for Plaintiffs' job, and during such testing, the employee is under the control and discretion of the employer.  In addition, drug testing is conducted for the primary benefit of the employer.  Consistent with our analysis with respect to pre- and post-trip activities, we find that mandatory drug testing is compensable even if the employer requires that the drug testing occur after the employee's normal working hours.[74]

Plaintiffs also suggest that an employee's travel time to and from mandatory drug testing is compensable.  Generally, an employee's travel from home to work before the regular workday and the employee's return home is a normal incident of employment, and as such, not compensable time.[75]  However, time spent in travel by an employee as part of the employee's principal activity must be compensated as hours worked.[76]  As example, "[i]f an employee normally finishes his work on the premises at 5 p.m. and is sent to another job which he finishes at 8 p.m. and is required to return to his employer's premises arriving at 9 p.m., all of the time is working time. However, if the employee goes home instead of returning to his employer's premises, the travel after 8 p.m. is

---

[72]*Barrentine v. Arkansas-Best Freight Sys, Inc.*, 750 F.2d 47, 50 (8th Cir. 1984) (citing *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956)).

[73]*Id.*

[74]*See* 29 U.S.C. § 201 *et seq.*; *see also Sehie v. City of Aurora*, 432 F.3d 749, 752-53 (7th Cir. 2005) (holding that the time spent attending mandatory counseling sessions outside the employee's normal work schedule was compensable, along with the two hour travel time to attend such counseling sessions); 29 C.F.R. § 785.43.

[75]*See Smith*, 462 F.3d at 1286; 29 C.F.R. § 785.35.

[76]29 C.F.R. § 785.38.

-24-

home-to-work travel and is not hours worked."[77]

Here, neither Plaintiffs nor Defendants have provided the Court with sufficient information to permit us to state, as a matter of law, whether the travel time associated with the drug testing mandated by Defendants in this case is hours worked so as to be compensable. As a result, we are unable to decide this issue as a matter of law at this time.

### 4. Mandatory safety meetings

Plaintiffs allege they are entitled to compensation for safety meetings in which Defendants required their attendance. Plaintiffs assert that Defendants have no policy for paying off-duty drivers for their attendance at these meetings, and as a result, "may or may not have been compensated for any or all of these mandatory meetings."[78] Plaintiffs contend that many of these meetings were held while drivers were off-duty, requiring many employees to return to work from home to attend. Plaintiffs describe the topics discussed as relating to their jobs duties, and they received safety or anti-union information. Defendants respond by asserting that whenever possible, safety meetings were scheduled when drivers were on duty to maximize attendance, but claim that they are unable to further respond to Plaintiffs' allegations regarding safety meetings without more specific information.

As previously mentioned, the FLSA requires that employers pay its employees for all hours worked.[79] As the Tenth Circuit has recognized, the DOL has promulgated regulations regarding meetings, which provide that:

---

[77]*Id.* (citing *Walling v. Mid-Continent Pipe Line Co.*, 143 F.2d 308 (10th Cir. 1944)).

[78]Plaintiffs' Motion for Partial Summary Judgment (Doc. 102, p. 11).

[79]*Fowler v. Incor*, 279 Fed. Appx. 590, 597 (10th Cir. 2008); 29 C.F.R. § 785.1.

Attendance at lectures, meetings, training programs and similar activities need not be counted as working time if the following four criteria are met:

(a) Attendance is outside of the employee's regular working hours;

(b) Attendance is in fact voluntary;

(c) The course, lecture, or meeting is not directly related to the employee's job; and

(d) The employee does not perform any productive work during such attendance.[80]

The DOL regulations further provide that "training is not "voluntary" if an employee's '[a]ttendance . . . is . . . required by the employer. It is not voluntary in fact if the employee is given to understand or led to believe that his present working conditions or the continuance of his employment would be adversely affected by nonattendance.'"[81]

Here, Plaintiffs indicate that "many" of the meetings to which they refer were directly related to their jobs.  However, the descriptions of these meetings provided to the Court as part of this motion are of such general nature that we are unable to determine, as a matter of law, that all of the "safety meetings" Plaintiffs attended meet the criteria for requiring compensation.  As a result, we decline to decide at this time, as a matter of law, that any particular meeting Plaintiff attended required compensation.

### C.  State Law Claims

Defendants move for summary judgment on all Plaintiffs' state law claims.  Plaintiffs' first allege that Defendants breached an implied contract with Plaintiffs whereby Defendants agreed to pay Plaintiffs for all non-driving activities, which include, *inter alia*, wait time, pre-trip and post-trip

---

[80]29 C.F.R. § 785.27.

[81]*Id.* (quoting  29 C.F.R. § 785.28).

inspections and servicing of vehicles, mandatory safety meetings, mandatory drug testing including travel time, and any and all other non-driving activities required for Plaintiffs to perform their jobs in a safe manner.  Plaintiffs also claim in the alternative to their breach of implied contract claim, that they are entitled to recover the value of their services under *quantum meruit*.  Lastly, Plaintiffs allege the breach of twelve state wage payment acts, claiming that because of Defendants' conduct, Plaintiffs are entitled to receive not only their back wages and overtime, but a penalty as determined by the particular state statute.

### 1. Breach of Implied Contract

Defendants contend that Plaintiffs' claim for breach of implied contract must fail because a party may not bring a claim under an implied contract theory when an express agreement between the parties exists.  Defendants argue that during the hiring process, each employee is informed of the method of compensation for the position, which the employee agrees to accept when taking the position.  Defendants further assert that the employees expressly agreed that they were at-will employees, and that in exchange for performing all services required for the particular driving position, which included those tasks necessary to achieve safe performance, the employee would receive pay in a specific amount per mile, and an amount per hour for wait time.  Defendants suggest that because Plaintiffs have provided no evidence of any agreement demonstrating that Defendants would pay an amount different from that agreed upon during the hiring process, Plaintiffs claim fails.

While Plaintiffs do not dispute that Defendants informed them during interview that they would be paid on a per mile basis for driving duties and on a per hour basis for non-driving activities, they disagree that there was any agreement that their pre- and post-trip duties, or other non-driving duties, would be unpaid.  Plaintiffs further dispute that the terms of any express, oral

contract included any terms suggesting that such payment scheme precluded payment for time worked outside of their normal shift, or excluded time worked for certain non-driving activities or non-revenue runs.  Accordingly, Plaintiffs assert that because the terms of any alleged express oral contract are disputed, Defendants are not entitled to summary judgment on their breach of implied contract claim.

An express contract can be either written or oral, and exists whenever there is a mutual meeting of the minds upon any contractual proposition.[82]  In contrast are implied contracts, of which there are two types: implied-in-fact and implied-in-law.  An implied-in-fact contract "arises from the facts and circumstances showing mutual intent to contract."[83]  Thus, an implied-in-fact contract is a true contract arising from mutual agreement and intent to promise, but where the agreement and promise have not been verbally expressed.[84]  An implied-in-law contract, or quasi contract, however, does not rest on an actual agreement.  Instead, it is one of legal fiction created by the courts to ensure justice or to prevent unjust enrichment.[85]

As a general rule, the existence of an express contract precludes the implication that an implied contract exists covering the same subject matter.[86]  In the absence of an express, written

---

[82]*Land v. Midwest Office Tech., Inc.*, 114 F. Supp. 2d 1121, 1146 n.7 (D. Kan. 2000); *Ellis v. Berry*, 19 Kan. App. 2d 105, 108, 867 P.2d 1063, 1066 (1993) (citing *In re Rogers*, 184 Kan. 24, 30, 334 P.2d 830 (1959)).

[83]*Smith v. Amoco Prod. Co.*, 272 Kan. 58, 70, 31 P.3d 255, 265 (2001).

[84]*In re Penn Cent. Transp. Co.*, 831 F.2d 1221, 1228 (3d Cir. 1987) (citing *Baltimore O.R.R. v. United States*, 261 U.S. 592, 597 (1923)).

[85]*Smith v. Amoco Prod. Co.*, 272 Kan. 58, 70, 31 P.3d 255, 265 (2001); *Mai v. Youtsey*, 231 Kan. 419, 422, 646 P.2d 475, 479 (1982).

[86]*Zwygart v. Bd. of County Comm'rs of Jefferson County, Kan.*, 483 F.3d 1086, 1094 (10th Cir. 2007) (applying Kansas law); *see also Cross Country Land Servs., Inc. v. PB Telecomms., Inc.*, 276 Fed. Appx. 825, 834 (10th Cir. 2008) (under Colorado law, an implied contract cannot exist where an express contract covers the same subject matter); *Barry Mogul & Assoc. v. Terrestris Dev. Co.*, 643 N.E.2d 245, 252 (Ill. App. Ct. 1994) (general rule

agreement, whether the parties had an express oral agreement covering the subject matter in question

is a question of fact.[87]   Here, Defendants claim that during the hiring process, they informed

Plaintiffs of the compensation structure for both driving activities and non-driving activities, and

Plaintiffs agreed that such payment would be the sole compensation for the duties performed,

including safety related tasks.  Plaintiffs, however, dispute that the parties agreed to such terms

during the interview process.  As the terms of an express oral agreement is a question of fact,

summary judgment based upon this oral agreement is not available.  The scope of the express oral

agreement directly impacts both the existence of and scope of any implied agreement.[88]  As a result,

sufficient material issues of disputed fact exist precluding summary judgment, and therefore,

Defendants motion is denied with respect to Plaintiffs' implied contract claim.[89]

### 2. Quantum Meruit

Defendants also moves for summary judgment on Plaintiffs' alternative claim that they are

---

is that no quasi-contractual claims may exist where there is an express contract between the parties); *Ericson v. Charles*, 108 Kan. 205, 194 P. 652, 653 (1921) (existence of express contract precludes existence of implied contract); *Shumaker v. Hazen*, 372 P.2d 873, 875 (Okla. 1962) (stating as a general proposition, "[t]here cannot be an express and an implied contract for the same thing existing at the same time").

[87]*In re Motor Fuel Temperature Sales Practices Litig.*, 534 F. Supp. 2d 1214, 1235 (D. Kan. 2008); *see Ellis*, 19 Kan. App. 2d at 108, 867 P.2d at 1066.

[88]*See Midwest Grain Prod., Inc. v. EnviroFuels Mktg., Inc.*, 948 F. Supp. 976, 980 (D. Kan. 1996) (an implied contract may exist when the terms of the alleged implied agreement does not conflict with the terms of an express agreement).

[89]Defendants also argue that they are entitled to summary judgment on Plaintiffs' implied contract claim based on Plaintiffs' at-will employment status.  Defendants contend that because Plaintiffs are at-will employees, Defendants can unilaterally change the compensation package from week to week, and where Plaintiffs continue to work under those terms, the complained-of payment structure represented the scope of the employment contract. Defendants seem to suggest that Plaintiffs acceptance of pay was an acceptance of the modified terms.  Defendants, however, have failed to demonstrate that Plaintiffs received notice of such change in terms prior to Plaintiffs earning such wages.  *See Salon Enter., Inc. v. Langford*, 29 Kan. App. 2d 268, 271, 31 P.3d 290, 292-93 (2000) (Kansas statutes do not prohibit at-will employee pay cuts announced before the wages are earned).  Therefore, we find this argument unsupported.

entitled to equitable relief under the theory of *quantum meruit* for the value of services provided to Defendants for all non-driving activities.   Defendants argue that they are entitled to summary judgment because *quantum meruit* is not a cause of action under Kansas law.   Defendants further assert that regardless of whether *quantum meruit* is a valid claim, Plaintiffs' claim fails because the terms of their express contract governs, and by Plaintiffs' continued service and acceptance of payment under those terms, they are precluded from asserting such a quasi-contractual remedy. Plaintiffs argue that absent a valid contract, or in a contract where an essential term is missing, Kansas recognizes a claim for recovery under *quantum meruit.* Because there are genuine issues of material facts in dispute with regards to the terms of the alleged express contract, Plaintiffs contend that they are entitled to bring this claim to recover in the alternative for services they rendered for Defendants' benefit.

        To establish a claim for *quantum meruit* under Kansas law, Plaintiffs must prove three elements: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.[90]   Kansas recognizes *quantum meruit* as an equitable claim for relief to permit recovery where no valid contract exists.[91]   With regard to these elements, Defendants appear to dispute only that they retained the benefit of services performed by Plaintiffs without providing payment.   Defendants posit that the services Plaintiffs rendered on Defendants' behalf

---

        [90]*Midwest Grain*, 1998 WL 63077, at *5 (applying Kansas law and citing *J.W. Thompson Co. v. Welles Prods. Corp.*, 243 Kan. 503, 512, 758 P.2d 738 (1988)).

        [91]*See Woodmont Corp. v. Rockwood Ctr. P'Ship*, 852 F. Supp. 948, 955 n.12 (D. Kan. 1994) (citing *Ridgway v. Wetterhold*, 96 Kan. 736, 737, 153 P. 490 (1915)).

were paid according to the compensation plan that each employee agreed to accept as payment for work performed when accepting their position.  This argument, however, raises a factual question for a jury to decide.  In addition, disputes remain as to the material terms of the parties' alleged oral contract concerning compensation.  Therefore, because the existence of disputed material facts precludes summary judgment, we deny Defendants' motion.

### 3. State Wage Payment Act Claims

In their Complaint, Plaintiffs allege breach of twelve state wage payment acts, and cite to those statutes which would provide them relief.  Defendants move for summary judgment, primarily asserting the same arguments as previously discussed, in that the terms of the parties' express, oral contract govern the amount of wages due.  Defendants argue that none of the statutes provide Plaintiffs with "any cause of action or any basis for recovery of any amounts owed beyond or in addition to the agreed-upon compensation established by contractual agreement,"[92] and as a result, they are entitled to summary judgment.  As discussed in this opinion, disputed issues of material fact remain as to the terms of such oral agreements, which are issues to be resolved by a jury, not this Court.  Therefore, summary judgment is denied with regard to these claims.

Accordingly,

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Doc. 101) is hereby GRANTED in part, and DENIED in part.

**IT IS FURTHER ORDERED** that Corporate Defendants' Motion for Partial Summary Judgment on Plaintiffs' FLSA Claims (Doc. 277) is hereby DENIED.

**IT IS FURTHER ORDERED** that Corporate Defendants' Motion for Partial Summary

---

[92]Defendants' Motion for Summary Judgment (Doc. 280, pp.16-17).

Judgment on Plaintiffs' State Law Claims (Doc. 279) is hereby DENIED.

**IT IS FURTHER ORDERED** that Defendants Boyes' and Lyn's Partial Motion for Summary Judgment on Plaintiffs' FLSA Claims (Doc. 283) is hereby DENIED.

**IT IS FURTHER ORDERED** that Defendants Boyes' and Lyn's Partial Motion for Summary Judgment on Plaintiffs' State Law Claims (Doc. 284) is hereby DENIED.

**IT IS SO ORDERED.**

Dated this 30th day of October, 2009, in Wichita, Kansas.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE